**ALPHA OIL AND GAS, INC., et al., Appellants,**

v.

**STATE of Texas, Appellee.**

**No. 3–87–032–CV.**

Court of Appeals of Texas, Austin.

Aug. 12, 1987.

Rehearing Denied Sept. 16, 1987.

Robert L. Lipstet, Constance G. Decker, Lipstet, Singer, Hirsch & Wagner, Houston, for United Pacific Ins. Co.

Larry R. Boyd, Christopher G. Gallavan, Wesner, Coke, Boyd & Clymer, P.C., Dallas, for Alpha Oil & Gas, Inc.

Jim Mattox, Atty. Gen., Joe Foy, Jr., Asst. Atty. Gen., Austin, for appellee.

Before POWERS, GAMMAGE and CARROLL, JJ.

POWERS, Justice.

On motion for summary judgment, the State of Texas recovered judgment on a performance bond, in the face amount of the bond, given by Alpha Oil and Gas, Inc. (Alpha) as principal and United Pacific Insurance Company (United) as surety. The summary judgment was later incorporated in a final judgment awarding other relief between the parties, from which Alpha and United appeal. The summary judgment is erroneous and, accordingly, we will reverse the judgment and remand the cause for a new trial.

The bond declares that Alpha and United, as principal and surety, respectively, "are held and firmly bound unto the State of Texas in the [amount of $250,000] conditioned that [certain oil and gas leases] will b́e placed in full compliance with all rules and regulations of the Railroad Commission of Texas within 12 months from the effective date hereof." Alpha and United executed the bond on June 8, 1983, and it was apparently delivered to the Texas Railroad Commission, for the State, on July 9, 1983.[1]

---

**1.** The terms of the bond were as follows:

PERFORMANCE BOND

State of California §
County of Los Angeles §

Know all men by these presents, that we, Alpha Oil & Gas, Inc., a subsidiary of Veta Grande Companies, Inc., as Principal and United Pacific Insurance Company, a corporation, as Surety, are held and firmly bound unto the State of Texás in the sum of Two Hundred Fifty Thousand Dollars & no/100 ($250,000.00) conditioned that the leases [unintelligible] will be placed in full compliance with all rules and regulations of the Railroad Commission of Texas within 12 months from the effective date hereof.

It appears that a primary purpose of the bond was to secure the "plugging" of certain abandoned oil wells on the leases designated in the bond, an action designed to prevent water pollution in the form of substances emanating from the wells. The Texas Railroad Commission is given regulatory power over oil and gas wells for the purpose of protecting these wells against such water pollution, and the Legislature has provided a comprehensive regulatory scheme in that regard. *See* Tex.Nat.Res. Code Ann. §§ 89.001–.121; §§ 91.101–.108 (1978 & Supp.1987).[2]

See schedule A, attached hereto and incorporated herein for any and all purposes of [sic] the leases which this bond is to cover.

It is agreed and understood that this Performance Bond shall be of definite term and shall cease to exist upon the expiration of one year from date of execution, or upon receipt and approval by The State of Texas of proof that all of the wells on the lease herein referred to have either been plugged and abandoned, or restored to beneficial use.

Provided further, that no party other than the named Obligee, its administrators or assigns shall have any right of action under this bond. It is further conditioned that the Surety may, at any time, terminate its liability upon giving thirty (30) days written notice to the Obligee, in which event, the Surety's liability shall, at the expiration of said thirty (30) days, terminate except as to such liability of the principal as may have accrued prior to the expiration of said thirty (30) days.

In witness thereof, the said Principal and Surety have hereunto set their hands and seals, this 8th day of June, 1983.

[signatures]

\* \* \* \* \* \*

### SCHEDULE A

| | | | |
|---|---|---|---|
| J.E. Coggins (00387) | Plugging | Docket | 5–67,714 |
| Pat Collins (01775) | " | " | 5–60,073 |
| ~~J.M. Dickson (01354)~~ | ~~"~~ | ~~"~~ | ~~5–67,718~~ |
| B.F. Dill (01776) | " | " | 5–60,073 |
| T.W. Martin (01388) | " | " | 5–67,715 |
| W.J. McKie (00252) | " | " | 5–67,716 |
| R.B. Richardson (01659) | " | " | 5–67,719 |
| Edens lease (01403) | | | |
| Bunch-West Unit (01454) | | | |

All of the above listed wells are in the Corsicana (Shallow) Field, Navarro County, Texas.

Savannah Butts (06441)
~~George Ephriam [sic] (07167)~~
Webb Kennedy (06442)
Emma Montgomery (06444)
Herring-Thornhill "A" (06456)
Herring-Thornhill "B" (06457)

All of these immediately above listed wells are in the East Texas Field, Rusk County, Texas.

---

**2.** Oil wastes and "brine" (ancient sea water trapped in oil and gas pools) may escape from oil wells and pollute ground or surface waters. One source of such pollution is abandoned wells and the Texas Railroad Commission is empowered to prevent such pollution from that source as set out in Chapters 89 and 91 of the Texas Natural Resources Code. *See generally,* Asworth & Calhoun, *Control of Oil Production Pollution,* 48 Tex.L.Rev. 1086 (1970).

The statutory duty to plug abandoned wells, now set out in Chapter 89 of the Code, apparently originated in 1899 for the purpose of preventing the destruction of oil and gas formations by invading waters. Acts 1899, 26th Leg., ch. 49, at 68. *See also,* Acts 1905, 29th Leg., ch. 119, at 228. In 1955, the contrary legislative purpose of preventing water pollution first appeared and a bond in the "penal sum" of $5,000 per well or $10,000 for all wells was first authorized to be required, "conditioned that the operator will plug and abandon said well in accordance with the laws of the State of Texas and the rules, regulations, and orders of the Railroad Commission." Acts 1955, 54th Leg., ch. 406, at 1097–98. By an amendment in 1969, the Legislature established the various plugging duties and remedies substantially in the form they now have in Chapter 89 of the Code. Acts 1965, 59th Leg., ch. 355, at 762.

Chapter 89 of the Code pertains to "Abandoned Wells." Under that section the operator, the owners of the working interest, and the landowners are made liable in various ways for the plugging of abandoned wells. In § 89.011 the operator is directed to plug the well properly "when required and in accordance with the

Alleging that neither Alpha nor United performed the bond undertaking within the 12 months required, the State sued them to recover the face amount of the bond ($250,000) "as damages for breach of the bond" together with attorney's fees, interest, and costs of suit.

The State moved for summary judgment on alternative grounds. First it requested judgment for the face amount of the bond, contending that the sum was intended to be liquidated, damages payable by Alpha and United if they failed to perform the condition stated in the bond—placing the leases "in full compliance with all rules and regulations" of the Commission within 12 months of the date of the bond. Under this contention, the actual amount of mon-

commission's rules that are in effect at the time of plugging." In certain circumstances, the Commission itself may plug the well, as provided in § 89.043. If the Commission does plug a well, § 89.083 authorizes it to bring "a cause of action for all reasonable expenses incurred in plugging the well ... according to the rules of the commission in effect at the time the well is plugged ...," first against the operator and second against an owner of the working interest. The Commission's claim is secured by liens against the "oil and gas in the land and the operator's fixtures, machinery, and equipment found or used on the land where the well is located (in the case of the operator)" and against the working interest of the owner thereof (in the case suit is brought against the owner of the working interest), as provided in § 89.083(b)(1), (2).

Chapter 91 of the Code pertains to several general provisions, including "Prevention of Pollution" as set out in Subchapter D. At the time the bond was given in the present controversy, § 91.103 of the Code provided that the Commission may require of "an operator" that he execute and file with the commission a bond when he (1) acquired a producing well and requests authorization to connect a producing well or wells to a pipeline or other outlet; or (2) filed a well potential form and brought into production a previously nonproducing well requiring him to apply for an allowable to produce oil and gas from the well. The bond, as provided in § 91.105, was required to "be in the penal sum of $5,000 for each well ... or, in lieu of a separate bond for each well, a blanket bond in the penal sum of $10,000 to cover all wells drilled, to be drilled, and to be operated in the state." The condition of the bond, as stated in § 91.106, was "that the operator will plug and abandon the well in accordance with the law of the state and the rules and orders of the commission."

So far as we are able to determine, the statutory scheme in effect at the time the bond was required and received in the present case (June-July 1983), did not provide expressly for such a bond, but only for the bond in a "penal sum" of $5,000-$10,000 as set out in §§ 91.103-.108 of the Code. Apparently, however, the bond was given under "Statewide Rule 14(b)(2)" promulgated by the Texas Railroad Commission. That rule provided as follows:

Plugging operations on each dry or inactive well must be commenced within a period of ninety days after drilling or operations have ceased and shall proceed with due diligence until completed.... For good cause, a reasonable explanation of time in which to start the plugging operations may be granted pursuant to the following procedures:

(A) The Oil and Gas Division Director or his delegate may administratively grant an extension of time if the well is not a pollution hazard; and ... [t]he operator posts a performance bond or other form of financial security in an amount acceptable to the staff to ensure that the Commission will not have to plug the well with state funds.

16 Tex.Admin.Code § 3.14 (1986).

Effective September 1, 1983, however, the Code was amended and rearranged so that § 91.104 (replacing the $5,000 to $10,000 "penal sum" provisions of the previous § 91.105) now provides as follows:

The commission may require that the bond be in an amount equal to the cost of plugging each well or in a blanket amount designed to assure the proper plugging of all wells drilled, to be drilled, or to be operated in this state.

The condition of the bond remains, under the amended and rearranged provisions, the same as it was previously under § 91.106 (presently found in § 91.105): "that the operator will plug and abandon the well in accordance with the law of the state and the rules and orders of the Commission."

Apparently, the statutory authority giving rise to the Commission's Statewide Rule 14(b)(2), which purportedly authorizes the bond required and given by Alpha and United, originated in the 1955 Act referred to above (§ 91.101 of the Code as it was in effect in June-July 1983). Under that rule, in any case, the bond is expressly referred to as being (1) "a performance bond or other form of financial security" bearing (2) "an amount acceptable to the staff" in order (3) to ensure "that the Commission will not have to plug the well with state funds." The bond in controversy, if required and given under Statewide Rule 14, is nothing more than security, of course. If Alpha and United fail or refuse to perform the condition of the bond, and the State requires the plugging of the wells, then the State *must* plug them "with state funds" if it wishes them plugged, having recourse to Alpha and United, on the bond, for the damages sustained by the State because of the breach.

ey required to compensate the State as damages for breach of the condition is immaterial. Second, the State requested judgment for $250,000, contending that its actual damages for breach of the condition were in excess of $250,000 and that it was entitled to that sum (for which it prayed) if the face amount of the bond was not intended to be a provision for liquidated damages or if it was not enforceable as such. We believe the State's first theory presents a question of law as to the proper construction of the bond while the second presents a question of whether the summary-judgment record established as a matter of law that the State's actual damages exceeded $250,000 and that the State was entitled to recover such sum for breach of the bond condition.

Because the summary judgment does not specify upon which theory it rests, we discuss both of the State's theories.

### LIQUIDATED DAMAGES

 We hold that the face amount of the bond was not intended to be a provision for liquidated damages.[3] Whether the parties so intended is to be determined from the terms of the bond and the statutory and regulatory framework in which it was required and given. *Howze v. Surety Corp. of America,* 584 S.W.2d 263 (Tex. 1979). We find nothing therein to indicate the requisite intention, and the State's theory appears to be an argument merely from silence.

The expression "liquidated damages" is not used in the bond or in the relevant statutes and regulations. Nothing in the bond, the statutes, or the regulations suggests that the amount of the bond was fixed according to the parties' estimate of actual damages. *Stewart v. Basey,* 150 Tex. 666, 245 S.W.2d 484 (1952). Nothing therein suggests that at the time of contracting the State's actual damages could not be ascertained with reasonable certainty or that their calculation would be difficult, as those damages might be sustained because of a failure to place the leases "in full compliance with all rules and regulations of the Railroad Commission of Texas" within the 12 months required. *Id.* Nothing in the State's affidavit claims any of these propositions or that the bond was required and given with the intention that the $250,000 represent a provision for liquidated damages.[4]

Conversely, if the parties did intend a bona fide contract provision for liquidated damages, in lieu of any right to recover actual or compensatory damages, which we believe is not the case, the provision manifestly would not be enforceable as such because the identical sum is payable for the grossest breach of the undertaking as well as a breach of the most technical or trivial provision found in any "rule" or "regulation" of the Commission, contrary to the principle of just compensation which underlies the enforceability of liquidated-damages provisions.[5] *Id.; Rio Grande Valley*

---

3. A surety may be liable for liquidated damages, if indeed, the principal has agreed with the creditor for the payment of liquidated damages, as determined by the general rules of contract law pertaining to that subject. 25 C.J.S. *Damages* § 110, at 1061 (1966).

4. Indeed, the Commission is given a statutory "cause of action for all reasonable expenses incurred in plugging" wells that require it, secured by the liens mentioned in § 89.083 of the Code. This clearly suggests a legislative intention that the Commission recover its actual costs while the "penal sum" previously recoverable, irrespective of actual costs, was apparently limited to $10,000.00 total or $5,000 per well. In the present controversy, moreover, the very affidavit and accompanying documents relied on by the State in support of its motion for summary judgment purport to establish with

reasonable certainty the damages the State sustained by reason of Alpha's failure to plug the abandoned wells in conformance with the pertinent statutes, rules, and orders of the Commission. In doing so, the State relies upon *average* or *standard* costs of plugging the very wells in question and upon a proration of *actual* administrative expenses incurred in plugging wells in a particular time period suggested to be typical. It is not contended that this method of estimating damages is difficult or that it was, for some reason, a method unavailable at the time of contracting.

5. We refer, for example, to Alpha's filing with the district court a single copy of the "plugging record" instead of the "duplicate" copies required by Commission rule. *See* 16 Tex.Admin. Code § 3.14(b).

*Sugar Growers, Inc. v. Campesi,* 592 S.W.2d 340, 340–43 (Tex.1979). This aspect of the bond demonstrates, of course, that the silence of the bond, the statutes, the regulations, and the affidavits could not reasonably be taken as indicating an intention to provide for liquidated damages simply because one well or all of them, on the leases in question, might not be "plugged" properly. This theory, apparently, is the only ground upon which the State relies in contending that the $250,000 was intended to be a statement of the amount of liquidated damages. Even this, however, violates the principle referred to and suggests, instead, that the parties intended the bond to secure the State in the actual amount of its damages, whatever the number of wells involved in any breach of the condition.

### THE STATE'S ENTITLEMENT TO ACTUAL DAMAGES AS A MATTER OF LAW

As mentioned above, the State contends alternatively that the summary-judgment record established as a matter of law its entitlement to damages in excess of $250,000 for breach of the bond condition, and, in consequence, the judgment of the trial court in that amount must be sustained whether or not that contract sum is enforceable as liquidated damages.

The motion for summary judgment, in pertinent part, alleges: "In any event, the estimated cost to the State of plugging the wells in violation exceeds the face amount of the bond. See, Affidavit of Paul Stagg, Exhibit A." Stagg's affidavit, attached to the motion for summary judgment, declares that his "inspection of the file [pertaining to the leases in question] revealed that all of the wells on all of the leases had not been placed on production, plugged, or otherwise brought into compliance with Railroad Commission of Texas Rule 14 as contemplated by the terms of [the bond]." In the following paragraphs, he declares:

IV

My review of the file in Oil and Gas Docket No. 5–85,894, indicates that [122] wells remain improperly abandoned (See attached Ex. 3). The estimated plugging and administrative costs to the state plugging these wells is [$389,425]. (See attached Exs. 4 & 5).

V

Based upon the results of my review of the file in Oil and Gas Docket No. 5–85,894, I attest to the fact that neither Alpha Oil & Gas, Inc. nor United Pacific Insurance Company brought all of the wells on all of the leases covered by the subject performance Bond No. U–435188 into full compliance with Commission regulations in accordance with the terms of [the bond] and their failure to comply with Commission rules and regulations has subjected the state to an estimated plugging liability in the amount of [$389,425].

I am personally acquainted with the facts set out above and am fully competent to testify to the matters stated in this affidavit.

The "file in Oil and Gas Docket No. 5–85,894" was not attached to Stagg's affidavit nor is it found anywhere in the summary-judgment record. Exhibit 3 is a photocopy of a memorandum from R.K. Earley, District Director of the Railroad Commission, to Willis C. Steed, Director of Field Operations, in which Earley states that the leases covered by the bond "were recently inspected by Commission personnel." The memorandum summarizes the status of each well and closes with the statement that "[c]opies of the inspection reports are herewith attached," although the copies are not included with the memorandum attached to Stagg's affidavit. Exhibit 4 is apparently a photocopy of two memoranda from Earley to Stagg, Assistant Director of Field Operations, that we shall here quote:

ALPHA OIL & GAS CORSICANA SHALLOW FIELD ESTIMATED COST OF PLUGGING OF ALL WELLS LISTED AS INACTIVE UPON LAST INSPECTION: (DUE TO UNKNOWN WELL CONDITIONS, THESE ESTIMATES ARE BASED

l

ON OUR STANDARD $1,200.00 PER WELL FOR THE CORSICANA SHALLOW FIELD.)

| LEASE | INACTIVE WELLS | INSP. DATE | COST PER |
|---|---|---|---|
| [COGGINS] | 25 | 3/20/86 | $ 30,000.00 |
| [COLLINS] | 3 | 4/04/86 | 3,600.00 |
| [MCKIE] | 12 | 4/04/86 | 14,400.00 |
| [DILL] | 2 | 4/04/86 | 2,400.00 |
| [EDENS] | 38 | 4/03/86 | 45,600.00 |
| [MARTIN] | 6 | 4/04/86 | 7,200.00 |
| [RICHARDSON] | 19 | 4/04/86 | 22,800.00 |
| [BUNCH WEST] | 2 | 4/02/86 | 2,400.00 |
| TOTALS | 107 WELLS | | $128,400.00 |

ALPHA OIL & GAS EAST TEXAS FIELD/RUSK CO. ESTIMATES BASED ON STANDARD 14(F)(2) EXCEPTIONS. ESTIMATED COST OF PLUGGING – $2.00 PER FT. – AVERAGE DEPTH – 3600 FT. PER WELL

| LEASE | INACTIVE WELLS | INSP. DATE | COST PER |
|---|---|---|---|
| [BUTTS] | 3 | 4/16/86 | $ |
| [KENNEDY] | 1 | 4/16/86 | |
| [MONTGOMERY] | 2 | 4/16/86 | |
| [HERRING "A"] | 7 | 4/16/86 | |
| [HERRING "B"] | 2 | 4/16/86 | |
| TOTALS | 14 [sic] | | $108,000.00 |

We note here that the total estimated cost of plugging shown on the two memoranda is $236,400. (The figure "14" was evidently intended to be 15, on the second memorandum, because that is the correct total of the wells listed and the multiplier necessary to produce the product of $108,000 at an average depth of 3600 feet and a cost-per-foot of $2.00). Exhibit 5 attached to Stagg's affidavit is a memorandum from him to a "file" not otherwise identified. In his memorandum, Stagg declares the subject to be "Administrative Costs of State Funded Pluggings." The memorandum states:

Between September 1, 1983 and March 31, 1986, ... 155 ... wells have been approved for state funded plugging. Total operating expenses have amounted to ... $1,578,278.18 ... which results in an average administrative expense of ... $1,257.59 ... per well.

The "average administrative expense" referred to, when multiplied by the 121 "inactive wells" listed in Exhibit 4, produces the sum of $152,168.39 and when that sum is added to the "plugging" costs of $236,400 shown on Exhibit 4, the total is $388,-568.39. This sum approximates the $389,-425.00 that Stagg's affidavit avers to be the State's "estimated plugging liability."

Exhibit 3, the memorandum from Earley to Steed, is neither verified by oath nor certified to be a true copy of the document it represents. Exhibits 4 and 5 are certified by the Secretary of the Railroad Commission to be "true and correct copies of [documents] on file with the Railroad Commission ... [who] certifies further that [he is] the legal custodian of the records, files and seal of the Railroad Commission of Texas."

■ We believe there are several reasons why the foregoing do not establish as a matter of law that the State is entitled to recover damages, for breach of contract, in excess of $250,000, the face amount of the bond.

Texas R.Civ.P.Ann. 166–A(e) (Supp.1987), provides as follows concerning the affidavits that accompany motions for summary judgment:

Supporting affidavits and opposing affidavits shall be made on personal knowledge, shall set forth such facts *as would be admissible in evidence*, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. *Sworn* or *certified* copies of

all papers or parts thereof referred to in an affidavit *shall be attached thereto or served therewith.* The court may permit affidavits to be supplemented or opposed by depositions or by further affidavits. Defects in the form of affidavits or attachments will not be grounds for reversal unless specifically pointed out by objection by an opposing party with opportunity, but refusal, to amend. (Emphasis added).

Approximately one month before the hearing on the State's motion for summary judgment, Alpha filed its response thereto. In the response, Alpha objected on the grounds hereafter set out, as well as others.

1. Approximately one month before the hearing on the State's motion for summary judgment, the opposing affidavit of Gerald Ezernach was also served and filed. In his affidavit, he substantially refuted the material declarations made in Stagg's affidavit and described the status of each of the contested wells based upon a "ground survey conducted by Alpha Oil & Gas, Inc. pursuant to [his] supervision and control together with a Railroad Commission representative, Mr. Dusty Peacock," the inspection having been made April 17, 1986.[6] The opposing affidavit, in our view, unquestionably created a genuine issue of material fact with respect to the status and condition of the various wells and the amount of damages to which the State would be entitled, if it was entitled to damages at all, precluding summary judgment under Rule 166–A.

2. The contents of all the documents attached to Stagg's affidavit were hearsay, in our view, and nothing in the summary-judgment record purports to bring them within an exception to the hearsay rule.

Moreover, those documents spoke only to the condition of the wells at a time in 1984 that was almost two years before the date of Stagg's affidavit, and, nothing in his affidavit, or elsewhere in the summary-judgment record, purported to declare that no intervening changes had occurred in the condition of the wells. The basis for Stagg's conclusions regarding the cost of "plugging" the various wells consists of opinions only (both in Stagg's affidavit and in the attached documents), based on averages or standard costs. The opposing affidavits contradict each other in this respect as well.

3. Exhibit 3 attached to Stagg's affidavit is not verified by anyone's oath nor is it certified to be a true copy of what it purports to be and, as mentioned above, it is hearsay. The "files" to which Stagg refers in his affidavit did not accompany his affidavit nor are they to be found elsewhere in the summary judgment record, if they consist of anything more than the documents attached to his affidavit.

For the foregoing reasons, we hold the trial court erred in awarding summary judgment on the ground that the State's damages were shown as a matter of law to exceed $250,000, if the judgment does indeed rest upon that ground.

We reverse the trial court judgment and remand the cause for new trial.

---

6. In Ezernach's affidavit, he states that he is "General Superintendent" of Alpha and that he supervised and controlled a "ground survey" of the wells in question, conducted together with Mr. Peacock on April 17, 1986. He avers that four of the wells referred to by Staggs "do not exist," 15 are "shut in pending testing but are not abandoned," 48 are in the process of being plugged, *eight* are currently producing, three "are undergoing W-10 production analysis to production," ten have been plugged, and so forth. Concerning the 14 wells referred to by Stagg in his affidavit, Ezernach gives his opinion that the approximate cost of plugging will be a total of $112,000. Stating that he is personally familiar with the "actual plugging costs of the Alpha Oil & Gas, Inc. wells," Ezernach states his opinion that the "actual cost to the State of Texas to plug the remaining inactive wells should not exceed $124,000 if Alpha Oil & Gas, Inc. does not plug them."